RENDERED: AUGUST 27, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0276-MR

CLYDE MYROM KINGERY, JR.                          APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE LAUREN ADAMS OGDEN, JUDGE
ACTION NO. 15-CI-502055


KRISTA WOOLFORD                                      APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, JONES, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: Clyde Myrom Kingery, Jr. appeals from a Jefferson

Family Court judgment awarding sole custody of the parties' minor child

("Child")[1] to Krista Woolford. We affirm.

---

[1] To protect the privacy of the parties' minor child, we will not refer to the minor child by name but simply as "Child."

## FACTS AND PROCEDURAL HISTORY

Kingery and Woolford were never married to each other, but they are the parents of Child, born in November 2014. In May 2015, Kingery filed a petition seeking sole custody of Child in family court. Over the next year, the family court entered orders establishing parenting time schedules with each party getting essentially equal parenting time. Kingery initially alleged that Woolford was abusing alcohol. Woolford claims to have achieved and maintained sobriety since July 2016.

The Jefferson Family Court set a September 2016 custody trial date. But shortly before the scheduled trial date, the family court removed this case from its trial docket because the parties failed to get an ordered assessment. The family court noted that the parties stated they could not afford to pay for the assessment.

The family court entered an agreed order setting forth a new temporary parenting schedule in early 2017, and the parties continued to litigate various matters. The parties have not cited to, nor have we independently discovered in the record, any previous court order formally ruling upon Kingery's petition for sole custody or explicitly setting forth that the parties had joint custody. But the parties proceeded with the understanding that they had joint custody and continued to exercise equal parenting time.

Woolford moved to Georgetown, Indiana.  Kingery remained in Louisville.  The parties had many conflicts about Child's care.

As summarized in the judgment on appeal here, the family court tried various interventions to assist the parties' efforts to co-parent, but the parties' inability or unwillingness to pay for certain interventions proved problematic:

> In May 2016, the Court ordered the parties to utilize a visitation exchange center due to ongoing contentious interactions at exchanges.  Mr. Kingery failed to pay the requisite fees, and the center closed the parties' case.

> In August 2017, the Court set aside its order for the parties to undergo an Issue Focused Assessment, which was designed to assist the Court in making a proper custody determination.  Again, payment was an issue.

> In February 2018, the Court appointed Ms. Russell Friend of the Court as a more cost-effective means of obtaining recommendations regarding custody and parenting time.  The parties have cooperated with Ms. Russell, but Mr. Kingery has not paid her fees in a timely manner.

> In February 2018, the Court also ordered the parties to communicate through Our Family Wizard ("OFW") – a co-parenting website that documents all activity.[2]

---

[2] For example, OFW provided automatic read receipts for messages sent through it according to trial testimony.

(Record on appeal ("R."), pp. 701-02.) Despite the family court's interventions to facilitate co-parenting, the parties continued to have significant conflicts about Child's care and were frequently back in court on contempt motions and the like.

Kingery alleged that Woolford was abusing alcohol again and that Child's older half-sibling from Woolford's former marriage was violent and a danger to Child. Kingery filed an emergency motion to suspend the current visitation schedule in 2018, alleging that the older half-sibling had touched Child's genitals and that Child would have to go to foster care if Woolford continued to have visitation due to a pending investigation in Indiana. The family court entered an order providing that Woolford's visitation with Child must be supervised.

A few weeks later, after the abuse allegations were determined to be "unsubstantiated" by the Indiana Department of Child Services, the family court vacated its order requiring that Woolford's visitation be supervised. But it required that the older half-sibling be supervised at all times during Woolford's parenting time. Woolford alleged that Kingery coached Child to allege abuse by her older half-sibling, and the parties continued to have conflicts resulting in additional litigation before the family court.

In August 2019, Woolford filed a motion requesting that the family court modify legal custody of Child and grant her sole legal custody. Woolford alleged that joint custody was unworkable and only created conflict because

Kingery refused to communicate and made unilateral parenting decisions. She requested an evidentiary hearing and attached a supporting affidavit.

In her affidavit, Woolford averred that she had sent Kingery messages via OFW in May but these messages appeared unread as of mid-July. She also averred that she had emailed Kingery about the possibility of enrolling Child in preschool at a private school in Indiana located approximately halfway between Woolford's house and Kingery's house. (An email attached to her affidavit indicated Child could receive scholarships for future school years if she attended preschool at the private school.) She averred that she was not asking Kingery to contribute to the cost of Child's attendance. She further averred that he did not respond to her email, but simply sent her an email stating that he had already enrolled Child in preschool elsewhere.

Woolford also averred that Kingery was making dangerous, unilateral medical decisions for Child. Specifically, she averred that he had Child get some vaccines without notifying her or consulting Woolford beforehand and had taken Child to a different pediatrician who had not– to Woolford's knowledge– previously treated Child.

The family court set a trial date for a few months later. Before the trial was held, Woolford filed an additional, verified motion seeking an order to prohibit Kingery from making unilateral life decisions for Child. She alleged

therein that Kingery acted as if he had sole custody by unilaterally changing Child's pediatrician and dentist to ones located nearer his home. The family court granted Woolford's motion and entered an order prohibiting Kingery from making such unilateral life decisions.

Before the custody trial was held, the family court asked the Friend of the Court (FOC) to prepare a report with recommendations for the family court's review. After meeting with the parties and counsel, the FOC filed a report recommending that the parties continue to exercise joint custody with a parenting coordinator to act as a tie-breaker when the parties could not agree on a particular decision. The FOC found both parties to be fit parents who could make good decisions but could not communicate effectively with each other, and she discussed how their living in different states posed difficulties. If the family court chose not to continue joint custody, she recommended that Woolford be awarded sole legal custody based on her seeming more willing to provide information to and seek input from Kingery. But the FOC recommended sole custody only if the family court determined that a parenting coordinator could not assist the parties.

Woolford objected to the recommendation to continue joint custody with the aid of a parenting coordinator. She alleged that Kingery had a history of failing to pay for court-ordered assessments by professionals. Kingery did not

object to using a parenting coordinator and indicated his desire for continued joint custody at trial by stating he did not want either party to lose custody.[3]

Following the custody trial, the family court entered an order which stated that the parties previously had joint legal custody under operation of law, but which now awarded sole legal custody to Woolford. The order nonetheless made clear that the parties would continue to have equal parenting time and that Kingery would have access to Child's records, caregivers, medical and dental providers, and educators. But the family court found that joint custody had proved unworkable in this case and that appointment of a parenting coordinator would not be helpful. The family court determined it was in Child's best interest for Woolford to have sole legal custody and the final say in making major decisions.

Kingery filed a motion to alter, amend, or vacate pursuant to Kentucky Rules of Civil Procedure (CR) 59.05. After a hearing, the family court entered a written order denying his CR 59.05 motion. Kingery then filed a timely appeal of the family court's custody decision. Further facts will be provided as needed.

---

[3] From our review of the written record, Kingery apparently did not file written responses to Woolford's motion requesting sole custody– styled as a motion for modification of custody– nor to her motion to prohibit him from making unilateral life decisions regarding Child. Although Kingery had originally sought sole custody when this case was first filed in Jefferson Family Court, there is no indication that he was still actively pursuing sole custody by the time of the early 2020 custody trial based on his testimony that he did not want either party to lose custody.

## STANDARD OF REVIEW

As an appellate court reviewing the family court's child custody decision, we must not focus on whether we would have made the same decision. Instead, we consider whether the factual findings are supported by substantial evidence, whether the correct law was applied, and whether the family court abused its discretion– keeping in mind the family court's unique opportunity to weigh the evidence and assess the credibility of witnesses:

> Since the family court is in the best position to evaluate the testimony and to weigh the evidence, an appellate court should not substitute its own opinion for that of the family court. If the findings of fact are supported by substantial evidence and if the correct law is applied, a family court's ultimate decision regarding custody will not be disturbed, absent an abuse of discretion. Abuse of discretion implies that the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*Coffman v. Rankin*, 260 S.W.3d 767, 770 (Ky. 2008).

Kingery alleges several errors[4] by the family court in his brief. But his brief fails to comply with CR 76.12(4)(c)(v)'s requirement that the argument

---

[4] With the possible exception of his arguments that the family court erred in admitting or excluding evidence, Kingery does not argue that the family court failed to apply the correct law. Instead, his arguments involve claims of abuse of discretion and of error in factual findings. For example, he did not argue that the family court applied the wrong legal standard for determining

portion of appellate briefs contain statements identifying whether and how issues were preserved for review with supporting references to the record. Due to this failure to comply with the rule, this Court would have the authority to strike all or part of his brief or to review only for manifest injustice. *Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010). Though we leniently elect instead to overlook such errors and to review the case under our usual standard of review for child custody decisions, we caution counsel to take greater care to comply with appellate brief requirements. We direct counsel's attention to the *Basic Appellate Practice Handbook* at: https://kycourts.gov/Courts/Court-of-Appeals/Documents/P56BasicAppellate PracticeHandbook.pdf. (Last visited Jun. 17, 2021).

## ANALYSIS

The first error alleged by Kingery is that the family court did not afford him a full, substantive hearing where he was provided sufficient time to testify, present evidence, and cross-examine Woolford. We disagree.

The family court advised the parties at the trial's beginning that it was allowing one half day for testimony, beginning at about 8:30 A.M. and concluding

---

or modifying custody. *See generally* Kentucky Revised Statutes (KRS) 403.270, KRS 403.340. The family court noted an obligation to determine what was in the best interests of Child, with a rebuttable presumption that joint custody and equal parenting time is in a child's best interest in its custody judgment.

at noon, and that this should be ample time as the case was not particularly complex. And the family court repeatedly advised the parties of the time limits for the hearing and suggested that certain things be wrapped up at certain points to permit all needed testimony within the stated hearing duration. For example, when Woolford's testimony extended past 10:00 A.M. yet the FOC and Kingery had yet to testify, the family court suggested that time be managed so that Kingery's testimony could begin by about 11:00 A.M. to allow him ample time to be heard. At 10:19 A.M., the family court informed Kingery's attorney that his time for cross-examining Woolford was up and he requested a continuance which the family court denied, noting that the parties had only asked for a half-day hearing and that he had spent a lot of time on the same issues.

After testimony by Woolford and the FOC, Kingery began his testimony about 11:15 A.M., and the family court indicated that about twenty minutes should be afforded for direct examination so that there would also be time for cross-examination. After Kingery's testimony concluded about 11:45 A.M., his attorney requested five minutes for closing argument and the family court allowed each party's attorney to argue for a few minutes so that the proceedings concluded by about noon as scheduled.

Kingery complains that Woolford testified much longer than he did and that he was not afforded sufficient time to cross-examine her or to present

desired evidence. From our review of the recorded hearing, although Woolford's testimony lasted longer than Kingery's, this appears largely due to the length of time of Kingery's counsel's cross-examination (about an hour). We conclude the family court afforded sufficient opportunity for each party to present proof, cross-examine witnesses, and make arguments despite enforcing reasonable time limits based on our review of the record.

As the family court aptly stated in its order denying Kingery's CR 59.05 motion: "It is not this Court's responsibility to manage counsel's case. The Court, is however, authorized to impose reasonable time limits on hearings and has the discretion to control the amount of evidence produced on a particular point. *Addison v. Addison*, 463 S.W.3d 755 (Ky. 2015)." (R., p. 738.) Also, Kingery has not pointed with requisite specificity to additional testimony or evidence he wanted to present but could not due to the time limits imposed by the family court which would have likely changed the outcome here.

We discern no abuse of discretion in the family court's establishing and enforcing reasonable time limits from our review of the record– especially given the family court's familiarity with the case and the detailed report and recommendations of the FOC on this custody matter. *See Addison*, 463 S.W.3d at 762-63 (holding there was no abuse of discretion in fixing reasonable time limits

-11-

for custody modification hearing, considering trial court's familiarity with the case and the preparation of a report and recommendations by a psychologist).

Next, Kingery argues the family court erred in not admitting into evidence a letter from a medical office indicating that Child had been dropped as a patient due to frequent failure to attend scheduled appointments. Woolford objected to admission of the letter, which Kingery argued was a certified business record. Woolford pointed out this letter was neither signed nor dated nor was it provided as part of Child's whole medical record from this provider.[5] She argued this was not a record produced in the regular course of business but was produced in anticipation of litigation.

The family court agreed with Woolford that the letter could not be properly admitted as a certified business record. In its order denying Kingery's CR 59.05 motion, the family court explained the letter "did not appear to be a record kept in the ordinary course of business, rather, prepared in anticipation of litigation. The document is notarized, but not signed (it is typewritten) and on whole, lacks any indicia of reliability." (R., p. 740.)

Kingery argues the letter showed that Woolford lied about the real reason for her switching Child's pediatrician. (Woolford had testified to changing

_____

[5] Woolford's counsel suggested that the proof could be held open to permit Kingery to submit the entire medical record for Child from this particular provider so that Kingery could present the letter as part of this record. But Kingery evidently did not opt to pursue this option.

doctors because of a change in her health insurance.)  Kingery contends the family court relied on Woolford's "lie" in reaching its decision.

Regardless of the reasoning behind Woolford's taking Child to a new doctor, however, the family court explicitly stated that the letter would not change its child custody decision in its order denying the CR 59.05 motion.  Even assuming *arguendo* some error in the family court's exclusion of the evidence, we cannot reverse for any evidentiary error which does not affect the parties' substantial rights.  Kentucky Rules of Evidence (KRE) 103(a); CR 61.01.

Though Kingery argues in his brief that the exclusion of the letter affected his substantial rights, we disagree.  The reason for Woolford's changing Child's doctor in this particular instance was not a key factor in the family court's decision.  Instead, the family court expressly found that both parties had made unilateral decisions about Child's medical care at times, but it determined that sole custody was in Child's best interest due to the parties' inability to communicate and make decisions together.  And it determined that Woolford should have sole custody based on its finding that she was the party who made more effort to involve the other in decision-making.

Furthermore, other than quoting KRE 803(6)(a) and making a conclusory argument that the letter was "an appropriately certified business record which should have been entered into the record and considered by the Court[,]"

(Appellant's brief, p. 9), Kingery fails to cite cases or otherwise indicate how the family court allegedly misapplied governing evidentiary rules or other law in excluding the letter. And we discern no misapplication of governing evidentiary rules or other law in not admitting into evidence this unsigned, undated letter– clearly not a medical chart– with no certification from a records custodian. *See generally* KRE 803(6)(a), KRE 902(11).

Next, Kingery alleges that the family court erred in admitting into evidence email(s)[6] which had not been provided as part of pretrial disclosure. Kingery does not specify the content of this email(s) or how its admission into evidence prejudiced his substantial rights. *See* KRE 103, CR 61.01. Despite a similar lack of specificity in his CR 59.05 motion, the family court presumed in its order denying CR 59.05 relief that he was referring to emails admitted in rebuttal of his testimony of recent improvements in communication.

As expressed in its order denying Kingery's motion to alter, amend, or vacate, the family court held that Woolford was not obligated to provide the email evidence in advance because it was rebuttal evidence and further found "the emails

---

[6] Kingery complains of the admission of an unspecified, singular email in his brief. From our review of the portion of the recorded hearing wherein Kingery objected to email evidence offered by Woolford for rebuttal, it is unclear whether he was objecting to just one particular email or a series of emails between the parties. Woolford discusses the issue as involving an email chain in her brief, and the family court referenced Kingery's objection to emails– plural– in its order denying his motion to alter, amend, or vacate.

were between the parties and so they were at all times known to, and in the possession, of the Petitioner [Kingery]." (R., p. 740.)

From our review of the recorded hearing, Kingery objected to the admission of an email exchange between the parties which occurred just a few days prior to trial and well after the pretrial disclosure deadline (14 days before trial). The crux of the email exchange was that Woolford notified him of Child's upcoming dental appointment and that Kingery did not directly respond to her email but sent an email a few days later informing her that he had scheduled Child's dental appointment for a different date and time at a different office. Kingery testified that he had only scheduled an appointment when called by the dentist's office to remind him that Child was due for an appointment and that he had asked the caller whether there were any other appointments scheduled.

We discern no abuse of discretion in the family court's admission of the email evidence as rebuttal evidence since Kingery should have been aware of the existence of recent emails between the parties and such recent emails were not in existence at the pretrial disclosure deadline. And clearly such email evidence had relevance to the determination of an important matter in controversy– whether there was any recent improvement in the parties' communications. *See generally* KRE 401, KRE 402. Furthermore, Kingery was able to testify to explain why he

had scheduled another appointment after Woolford's email. In short, we discern no reversible error in the admission of the email evidence in rebuttal.

Lastly, Kingery takes issue with the family court's factual findings on several matters. None of these matters appears solely determinative of the family court's ultimate custody decision, and they appear not to be major bases of the ultimate custody decision.

Kingery takes issues with the family court's findings that he "has no stable work history" and "is reportedly unable to work at this time due to a back injury." (R., p. 700.) He asserts there was no testimony regarding his work history presented at the custody trial, that he is currently employed, and that he has maintained employment except for a brief period wherein he received workers' compensation benefits for a work-related injury. We note that the family court also found: "During the course of this litigation, he [Kingery] has worked as an actor and a warehouse employee." (R., p. 700.)

To the extent that findings about his employment history or current employment may be inaccurate, any such error is harmless under CR 61.01. From our review of the record, the family court's child custody decision did not hinge on Kingery's past or present employment but on its findings that the parties did not effectively communicate to make decisions together, although Woolford made efforts to inform and engage the other party. Any errors in the family court's

findings as to Kingery's past or present employment did not ultimately affect its child custody decision and are therefore harmless. CR 61.01.

Next, Kingery argues the family court erred in finding that he "made unfounded reports" of child abuse. (R., p. 701.) He points to the investigation of Woolford's home by the Indiana Department of Child Services relating to Child's older half-sibling from Woolford's prior marriage. Kingery contends that Child told multiple third parties she had been abused by her half-sibling. He also asserts Child was at risk of going into foster care due to the investigation unless he requested an emergency custody order, which resulted in Woolford's visitation being restricted to supervised visitation while the investigation was pending. He admits that the Indiana authorities ultimately determined the allegations of child abuse to be unsubstantiated. But because the investigation continued for months, he contends that it was inaccurate for the family court to find that child abuse reports were "unfounded" unless it used that term as a synonym for "unsubstantiated" rather than as meaning "lacking a sound basis." (Appellant's brief, pp. 12-13.)

Regardless of whether the family court meant that Kingery falsely reported abuse or legitimately reported allegations by Child which ultimately could not be substantiated, the finding that Kingery made unfounded reports of child abuse is not clearly erroneous. As the fact-finder, the family court was free to

judge the credibility of testimony and to make reasonable inferences from the evidence presented, provided that it did not compound inference on inference. *K.H. v. Cabinet for Health and Family Services*, 358 S.W.3d 29, 32 (Ky. App. 2011). As the FOC testified that Child's demeanor changed during discussion of abuse allegations and that Child only discussed such allegations when prompted by Kingery's wife,[7] the family court's finding that Kingery made unfounded child abuse reports is supported by substantial evidence and reasonable inferences therefrom. Thus, we cannot say that the family court's finding on this matter was clearly erroneous, although perhaps another fact-finder may not have made the exact same finding.

Kingery also challenges the accuracy of the family court's finding that "Ms. Woolford has used OFW as ordered, but Mr. Kingery is generally unresponsive." (R., p. 702.) Kingery contends that both parties used OFW as well as other means of communication such as emails and texts and that both parties did not use OFW exclusively as ordered by the family court. He contends there is

---

[7] Although the FOC elected not to speak with Child before preparing a report for the family court's review prior to the custody trial, the FOC had previously prepared other reports at the family court's request– including a report making recommendations during the pendency of Kingery's emergency motion and the Indiana investigation of abuse allegations. The FOC spoke with Child in preparing her earlier report and then testified at the custody trial about her interactions with Child.

insufficient evidence to support the family court's finding that Woolford used OFW but that Kingery was unresponsive.

Although Kingery appears correct that both parties utilized OFW at least to some extent,[8] we discern no clear error in the family court's finding that Kingery was not using OFW as ordered or was generally unresponsive. Substantial evidence supports the family court's finding– including testimony from Woolford about Kingery not responding to at least some OFW messages about Child's medical or dental appointments and then sometimes rescheduling such appointments without consulting Woolford. To the extent that Kingery's testimony conflicted with that of Woolford, the family court was entitled to determine which testimony it found more credible. *Moore v. Asente*, 110 S.W.3d 336, 354-55 (Ky. 2003).

Kingery also contends the family court erred in finding that he did not regularly participate in Child's medical care and that he came to the hospital when Child broke her arm but failed to attend follow-up visits. He claims he testified to attending follow-up visits to the orthopedic specialist, that Woolford admitted to his being involved in Child's medical care– particularly over the last three years–

---

[8] For example, the family court found that Kingery informed Woolford via OFW that he had updated Child's vaccination at the same medical practice where Child was seen by her original pediatrician after initially refusing to respond to her questions about where Child was vaccinated. (R., pp. 702-03.)

in her testimony, and that the FOC changed her opinion on the extent of his involvement in Child's medical care based on evidence presented at the hearing.

While there certainly appears to be some evidence of Kingery's being involved in Child's medical care especially in more recent years, at most the family court appears to have made a slight overstatement. We construe the family court's findings to mean that although the parties initially agreed upon Child's original pediatrician, Kingery elected not to regularly participate in Child's medical care until recently. And this finding is supported by substantial evidence in the record– for example, testimony from Woolford that Kingery insisted for a long time that medical appointments occur only during Woolford's parenting time and not during his parenting time.

Furthermore, assuming *arguendo* that the family court erred in its findings regarding the degree of Kingery's participation in Child's medical care, any such error was harmless. The family court did not decide to discontinue joint custody and award Woolford sole custody based on lack of sufficient involvement by Kingery in Child's medical care, but on the parties' inability to communicate and make decisions together and on Kingery being the party less likely to seek input from the other party. As the custody decision did not hinge on a lack of sufficient involvement in Child's medical care by Kingery, any errors in the family

court's findings about the extent of his involvement in Child's medical care did not affect his substantial rights and were harmless.  CR 61.01.

Kingery also challenges the accuracy of the family court's finding that the new pediatrician (Dr. Eldridge) to whom Woolford recently brought Child for care had an office "near Mr. Kingery's home in Louisville."  (R., p. 702.) Although we agree with Kingery that trial testimony indicated that Dr. Eldridge had two Indiana locations but no Kentucky locations, Woolford testified to Dr. Eldridge's having an office between her home and Kingery's home located in New Albany, Indiana.  We do not construe the family court's finding to necessarily mean that Dr. Eldridge had a Louisville office, but that Dr. Eldridge had an office near Kingery's home (*i.e.*, the office in New Albany) as well as another location in Georgetown, Indiana near Woolford's home.  Whether the New Albany office was near Kingery's home in suburban Louisville is a matter of opinion, of course.

Even if the family court did err in its finding as to where Dr. Eldridge had medical offices, such error was harmless.  The family court's custody decision did not hinge on whether Dr. Eldridge had an office located in Louisville or near Kingery's home.  Instead, it found continued joint custody unviable based on the parties' lack of ability to communicate or make decisions together.  And it found Woolford's having sole custody appropriate due to its finding her to be the party more likely to try to keep the other informed and involved– such as by her

selecting a doctor with an office located between the parties' homes and advising Kingery of the doctor's having an office in New Albany, somewhat nearer to Kingery's home than the doctor's other office in Georgetown, Indiana. As the exact location of Dr. Eldridge's office vis-à-vis Kingery's home was not a factor in the family court's ultimate custody decision, it did not affect Kingery's substantial rights, and any error in this regard was harmless under CR 61.01.

Finally, Kingery challenges the family court's factual findings regarding the FOC's report related to the 2019-2020 school year. The family court found that when Woolford tried to get Kingery's input on enrolling Child at the private school in Indiana, Kingery failed to respond by email but in response to Woolford's raising the issue in person, he stated: "Allison addressed this." In a footnote, the family court explained the reference to "Allison" as: "[a]n apparent reference to the FOC's recommendation that Child attend preschool regularly, from both homes. The FOC has not addressed [Child's] school enrollment for the upcoming school year." (R., p. 703.) (Attorney Allison S. Russell served as the FOC appointed by the family court.)

Kingery argues the family court's findings need to be clarified to show that he was following the recommendation of the FOC in enrolling Child in preschool for the 2019-2020 year. And he argues that the FOC made no

recommendations about the 2020-2021 school year and that he was open to discussing schools with Woolford.

From our review of the record, we agree with Kingery that there was nothing necessarily improper in him registering Child for a preschool near him for the 2019-2020 year.  The FOC had previously recommended that both parties enroll Child in preschool or daycare during their parenting time.  Before Child reached grade school age, it was apparently even possible for each parent to utilize different facilities located near their respective homes during parenting time.

Rather than faulting Kingery for trying to enroll Child in preschool, we perceive that the family court was noting with disapproval that Kingery failed to respond to Woolford's attempts to discuss the possibility of Child attending preschool at the private school– particularly as Woolford indicated that that affected Child's ability to get scholarships for subsequent school years.  The FOC explained in her testimony that the private school which Woolford suggested only offered full-time preschool with no option for part-time attendance there.  The FOC's report noted that Child lost her spot at the private school due to Kingery's failure to timely respond to Woolford.

According to Kingery:  "There is insufficient evidence to support the finding that the FOC 'has not addressed [Child's] school enrollment for the upcoming year' with regards to the 2019-2020 school year."  (Appellant's brief, p.

16) (internal quotation marks omitted).  Perhaps he intends to argue that the family court failed to take note that the FOC's recommendation that Child attend preschool or daycare from each home applied to the 2019-2020 school year.

We construe the family court's statement that the FOC did not address enrollment for "the upcoming school year" as applying to the 2020-2021 school year given the January 2020 date of the trial and its judgment.  Furthermore, any error in the family court's brief allusion to the FOC's recommending preschool attendance and not addressing the upcoming school year is harmless.  CR 61.01.

Regardless of any specific FOC recommendations for future school enrollment and of Kingery's recent expressions of willingness to discuss future school enrollment with Woolford, there was substantial evidence of the parties frequently being unable to communicate or make such decisions together in the past.  And it is unlikely that Child could attend a different school while in each parent's care as she advances in her education.  (Child turns seven in fall 2021.)

Although the FOC thought both parents were fit and recommended the appointment of a parenting coordinator as a tiebreaker when the parents could not agree on such matters as school choice, the family court found that use of a parenting coordinator would not work because of the parties' prior failure to comply with court orders for assessments and "financial constraints." (R., p. 705.)  From our review of the written record, there were several orders finding that the

parties were unwilling or unable to pay for court-ordered assessments by professionals. And given the parties' continuing conflicts in exercising joint custody despite numerous interventions to assist them, the family court may have reasonably concluded that even the appointment of a parenting coordinator was unlikely to foreclose further contentious litigation concerning Child's school placement, medical care, and other matters.

Although awarding sole legal custody to Woolford, the family court explicitly ordered that Kingery have access to Child's records and to her medical and mental health providers, caregivers, and educators. And it did not order any change in the parties' long-standing exercise of equal parenting time to Child or their current parenting time schedule. But it nonetheless found it to be in Child's best interest for Woolford to have sole legal custody so that "Ms. Woolford will have final decision-making authority on all major issues involving [Child's] upbringing, including but not limited to her medical treatment, education, and religious upbringing." (R., p. 705.)

Again, the question is not whether this or some other court would make the same decision as the family court. Based on the record before us, it is possible that another court may have reasonably concluded that continued joint custody with a parenting coordinator to act as a tiebreaker was in Child's best interest. Or perhaps another court might have found Kingery's testimony to be

more credible than Woolford's or him to be the better choice for sole custodian. But based upon our review of the record, the family court did not make clearly erroneous findings on key factual matters, nor did it fail to apply the correct law, and we cannot say that it abused its discretion in deciding to award Woolford sole custody upon the record provided to us. Thus, we discern no reversible error. Any other issues or arguments raised by the parties in their briefs which are not discussed in this Opinion have been determined to lack merit or relevancy to our resolution of this appeal.

For the foregoing reasons, the judgment of the Jefferson Family Court is hereby **AFFIRMED**.

JONES, JUDGE, CONCURS.

TAYLOR, JUDGE, CONCURS IN RESULT ONLY.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Zachary J. Springer | John H. Helmers, Jr. |
| Louisville, Kentucky | Louisville, Kentucky |